UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cv-281-FDW
(3:12-cr-316-FDW-DSC-2)

| | | |
|---|---|---|
| JORGE MOLINA-SANCHEZ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), and on the Government's Motion to Dismiss, (Doc. No. 5).

**I.     BACKGROUND**

**1. Petitioner participates in a lucrative, eight-year cocaine-trafficking conspiracy.**

Beginning in 2004, pro se Petitioner Jorge Molina-Sanchez (referred to hereinafter as "Petitioner" or "Jorge") and his brother, Juan Molina-Sanchez ("Juan"), began trafficking large quantities of cocaine. (Crim. Case No. 3:12cr316-FDW-DSC-2, Doc. No. 60 at 22: Trial Tr.). The brothers got started through their cousin, Jose Luis Molina, and their uncle, who was their cocaine supplier. (Id. at 22-23). Jorge and Juan initially received two kilograms of cocaine that was transported from California to Salisbury, North Carolina, in a Ford Taurus with a secret compartment. (Id. at 23, 35). The first two kilograms were "fronted" to the brothers, who paid for it after distributing it, at which time their cousin and uncle made another delivery, this time of four kilograms. (Id. at 23-24). For the first year, Jorge and Juan received bi-monthly shipments of four kilograms of cocaine, with their uncle and cousin taking turns delivering the cocaine in

1

the Taurus with the hidden compartment. (Id. at 24). Beginning in 2005, Jorge and Juan doubled the amount of cocaine they received to eight kilograms per shipment and moved to a car with a bigger hidden compartment. (Id. at 25). They still received shipments every other month, and they eventually paid in cash for their cocaine. (Id. at 25, 27). They continued to transport the cocaine from California in automobiles with secret compartments, including a Toyota Camry, an Infinity I-30, a Chevrolet Malibu, and a BMW. (Id., Doc. No. 59 at 167; Doc. No. 60 at 43, 52).

After receiving a shipment, Jorge and Juan sold the cocaine to their customers. (Id., Doc. No. 60 at 25-26). A couple of customers bought kilogram-quantities; others bought ounces and quarter ounces. (Id. at 26). In terms of the working relationship between Jorge and Juan, they were equal partners in the business, but each brother would "work a few months, then he would be done working and then it would be [the other brother's] turn to work." (Id. at 29-30). The brothers shared the same customers, and when it was Jorge's turn to "work," he was solely responsible for transporting and distributing the cocaine. (Id. at 29-30). Each brother kept the profit he made during the shipments and distributions he was responsible for, "sav[ing] it, spend[ing] it, invest[ing] it in other things." (Id. at 30). Both brothers used profits to buy cars. (Id., Doc. No. 59 at 201; Doc. No. 60 at 31).

Lloyd Allen, the brothers' biggest customer in their first two years, began buying cocaine from Juan in 2004 and from Jorge in early 2005. (Id., Doc. No. 59 at 145-46). Initially, when he met Jorge, he bought four-and-a-half ounces from him for $3,500. (Id. at 147-48). Thereafter, he dealt with both Jorge and Juan regularly, describing the brothers as equal partners in the business. (Id. at 147-48, 182). By late 2005, Allen was buying nine ounces of cocaine every two or three weeks from Jorge and Juan. (Id. at 149). This quantity increased to half a kilogram per

2

transaction in 2006 and to kilogram quantities in 2007, peaking at four kilograms per transaction. (Id. at 149-52, 175). As long as Jorge and Juan had a supply, Allen continued to buy cocaine from them every two or three weeks, selling the cocaine he bought to customers. (Id. at 150). One of Allen's customers was Matt Jones, who in turn sold cocaine at Freightliner in Statesville, North Carolina, where he worked. (Id. at 154; see also id. at 176). Although Allen did not keep up with how many kilograms of cocaine he bought over the time he dealt with the brothers, he estimated that he bought a total of between 50 and 100 kilograms of cocaine. (Id. at 152-53).

Around 2007 or 2008, Jorge and Juan also began dealing with "Anthony," another customer who eventually bought three or four kilograms at a time. (Id., Doc. No. 60 at 26-27). By 2009, the brothers were sending their own couriers to California to get cocaine, and they were buying 11 kilograms of cocaine every other month. (Id. at 28-29). On each 11-kilogram shipment, Jorge and Juan would profit approximately $80,000. (Id. at 34-35). Jorge and Juan's sister, Susan Molina, and Juan's then-girlfriend, Sulay Lopez, worked as couriers for the brothers, traveling together six to eight times a year to California and driving back with 11 kilograms of cocaine in hidden compartments. (Id. at 35-37). Jorge bought a kilogram of heroin as part of the last shipment he received, intending to distribute it to Allen. (Id. at 38-39, 42, 54).

In February 2011, Lopez and Susan Molina were pulled over in Utah on their way back to North Carolina, and 11 kilograms of cocaine were seized from a hidden compartment in the car they were traveling in. (Id., Doc. No. 1 at 3; Doc. No. 60 at 37). A month later, law-enforcement officers conducting surveillance observed Juan enter a storage unit in Salisbury, North Carolina. (Id., Doc. No. 1 at 3; Doc. No. 48 at 30). In a later warrant-supported search of the storage unit, officers found approximately $30,000 in cash inside an Infinity I-30 registered to Juan. (Id., Doc. No. 1 at 3; Doc. No. 60 at 27-29, 32; Doc. No. 59 at 20).

3

In May 2011, law enforcement officers stopped a Chevrolet Tahoe in which Jorge was the driver and Juan was the passenger. (Id., Doc. No. 1 at 4; Doc. No. 59 at 57, 62). Although a drug detection dog alerted to the presence of controlled substances on the driver's-door seam, officers were not able to find controlled substances, though they did find handcuffs, binoculars, and a tactical holster. (Id., Doc. No. 1 at 4; Doc. No. 59 at 58-59, 63-64).

In the Spring of 2011, Jorge offered to sell Allen heroin, an offer Allen declined because he "didn't know [anyone who] was interested in it." (Id., Doc. No. 59 at 158-59). According to Allen, Jorge had what appeared to be a kilogram of heroin. (Id. at 160). Also in the spring of 2011, Jorge and Juan left the area, and Jorge called Allen, telling him that he did not know when he was coming back but that he had a new supplier out of town. (Id. at 158-59).

Two months later, having tracked the Infinity I-30 to the home of Joel Santibanez, the brothers' cousin, in Salisbury, law-enforcement officers conducted a knock-and-talk at the home and spoke with Santibanez. (Id., Doc. No. 1 at 4; Doc. No. 58 at 34). Santibanez permitted the search of certain areas but not an outbuilding or the Infinity I-30. (Id., Doc. No. 1 at 4; Doc. No. 58 at 35-36). While at the home, Special Agent William Elmore with Homeland Security Investigations recognized a pair of brand-new commercial lawnmowers and lawnmower trailers that he had previously seen Jorge working on at his home one evening while under surveillance. (Id. at 37, 40). At the time of the search, the lawnmowers had only 15-30 hours of use logged on them. (Id., Doc. No. 1 at 4; Doc. No. 58 at 35, 40-41). Santibanez reported to the officers that he worked with Jorge mowing lawns. (Id., Doc. No. 1 at 4). Also while at the home, agents searched a Chevrolet Malibu, registered to Jorge's wife, Yuritzi Alejandres, and located in a parking area beside the lawn equipment. (Id., Doc. No. 58 at 38-39). Inside the Malibu officers

found paperwork with Jorge's and Juan's names. (Id., Doc. No. 58 at 45-48; Doc. No. 59 at 25-26).

Later that same day, officers obtained a search warrant for the outbuilding and the Infinity I-30 inside the outbuilding. (Id., Doc. No. 1 at 5; Doc. No. 58 at 37). A search of the car yielded a hidden compartment in which the officers found more than $138,000 in cash, three kilograms of cocaine, and one kilogram of heroin. (Id., Doc. No. 1 at 5; Doc. No. 58 at 38, 41-44; Doc. No. 59 at 133, 135). The officers also found documents in the car in both Jorge's and Juan's names. (Id., Doc. No. 1 at 5). In addition to the car, officers found more brand-new lawn equipment inside the outbuilding. (Id., Doc. No. 58 at 41).

In August 2011, officers searched the home Jorge shared with his wife Alejandres in Salisbury. (Id., Doc. No. 59 at 78-79, 88). No one was home when the search took place, and although the downstairs area of the house was well kept, it appeared that items had been removed "in a hurry" from the upstairs bedrooms. (Id. at 80-81). Officers found a tactical holster, mail addressed to Juan, a business card and flyer for a landscaping business identifying Jorge and Juan as the owners of the business, and a notebook containing Juan's name and "Salt Lake City," and "70." (Id. at 81, 84-87, 89).

A month later, Allen was arrested after buying two kilograms of cocaine in a transaction set up by investigating officers. (Id. at 99-100, 161, 175-77). At the time of Allen's arrest, the Chevrolet Tahoe that he bought from Jorge was parked at his house. (Id. at 100-01). Following his arrest, Allen began working with the investigators and recorded conversations with Jorge and Juan. (Id. at 100, 103-04, 107-08, 163; Doc. No. 60 at 45).

In October 2011, Allen traveled to Las Vegas, Nevada, meeting with Juan before traveling toward California where they planned to pick up cocaine. (Id., Doc. No. 59 at 141-42,

5

168-70, 172; Doc. No. 60 at 46-47, 49). Law enforcement officers who were monitoring Allen's conversations with Juan arrested Juan as he and Allen traveled west from Las Vegas on Interstate 15 in a BMW with a California license plate. (Id., Doc. No. 59 at 142-43, 271; Doc. No. 60 at 44-45, 49).

In January 2012, Jorge called Deputy Ramsey, asking "what he could do to resolve his situation." (Id., Doc. No. 59 at 114). Deputy Ramsey encouraged Jorge to turn himself in, explaining that arrest warrants had been issued for him and that officers "wanted him to cooperate." (Id.). Nine months later, on October 11, 2012, officers finally arrested Jorge at an apartment to which they had tracked his cell phone. (Id., Doc. No. 58 at 54; Doc. No. 59 at 47-48, 72, 109, 116). After he was apprehended, Jorge told the officers that the apartment belonged to him and agreed that they could search the apartment. (Id., Doc. No. 58 at 56-57). Jorge also told the officers that he had been hiding out in California and admitted that the white BMW with California tags that Juan and Allen were traveling in when Juan was arrested belonged to him. (Id. at 57; Doc. No. 59 at 143-44; see also id. at 71-72). When agents later searched the BMW, they found a hidden compartment in the front quarter panel of the passenger's side. (Id. at 15-17).

During a search of Jorge's apartment, officers found a loaded handgun next to his bed, close to where his head would be if he were lying on the bed, and within a couple of feet of the gun, officers found a small mason jar with approximately three ounces of cocaine in it. (Id., Doc. No. 58 at 57, 63-64, 70-73; Doc. No. 59 at 45; Doc. No. 60 at 66-67). Officers also found a tactical holster with cash inside. (Id., Doc. No. 58 at 64). Jorge acknowledged that both the gun and the cocaine belonged to him. (Id. at 58). Officers also found a second loaded gun and ammunition in a bedroom adjacent to Jorge's. (Id. at 61-62, 70-71).

6

**2. Petitioner is convicted of four offenses related to his participation in the conspiracy.**

A grand jury indicted Petitioner and charged him with conspiracy to possess with intent to distribute cocaine and heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); participating in a money-laundering conspiracy, in violation of 18 U.S.C. § 1956(h); possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a) and (b)(1)(C); and possession of a firearm in furtherance of a drug-trafficking offense, in violation of 18 U.S.C. § 924(c). (Crim. Case No. 3:12cr316-FDW-DSC-2, Doc. No. 11 at 1-4: Indictment). The grand jury charged that the drug-trafficking conspiracy involved at least five kilograms of cocaine and at least one kilogram of heroin. (Id. at 1). The grand jury charged that Petitioner conspired to launder proceeds of drug sales (1) with the intent to promote further drug-trafficking transactions and (2) knowing that the transactions were designed to conceal and disguise the nature, location, source, ownership, and control of drug-transaction proceeds. (Id. at 2).

Petitioner's case was tried before a jury. Instructing the jury on the elements of the Section 924(c) firearm offense, this Court explained that the Government was required to prove (1) that Petitioner committed a drug-trafficking offense and (2) that Petitioner knowingly used a firearm during and in relation to one or both of the drug offenses charged in the indictment or knowingly possessed a firearm in furtherance of one or both of the drug offenses charged in the indictment. (Id., Doc. No. 60 at 106). This Court also explained to the jury that "[w]hile the government ha[d] charged in the conjunctive as to the alternative elements of" use or possession of a firearm, "the government only must prove in the disjunctive, meaning one of the alternative elements." (Id. at 108). This Court explained, however that "the jury must be unanimous as to at least one of these two elements"—using a firearm during and in relation to a drug-trafficking

offense or possession of a firearm in furtherance of a drug-trafficking offense—"to find the defendant guilty of the charge." (Id.).

Following their deliberations, the jury found Petitioner guilty of all charged offenses. (Id. at 147, 155-57). The jury also found that Petitioner conspired to distribute and possess with intent to distribute at least five kilograms of cocaine and at least one kilogram of heroin and that he conspired to launder money with the purpose of promoting a specified unlawful activity and to conceal and disguise the proceeds of a specified unlawful activity. (Id. at 147, 155-56).

**3. The Fourth Circuit affirms this Court's judgment, and Petitioner moves to vacate his conviction.**

Petitioner appealed his convictions and sentence, arguing that there was insufficient evidence to support his convictions, that this Court erred in certain of its evidentiary rulings, and that his sentence is procedurally and substantively unreasonable. See United States v. Molina-Sanchez, 630 F. App'x 173, 174-77 (4th Cir. 2016). The Fourth Circuit affirmed this Court's judgment. (Id. at 177). Petitioner filed a petition for writ of certiorari. United States v. Molina-Sanchez, Fourth Cir. Case No. 14-4880, Docket Entry 04/28/16. The Supreme Court denied the petition on May 31, 2016. (Id., Docket Entry 06/01/16).

Petitioner timely filed the present Section 2255 motion on May 26, 2017. (Civ. Doc. No. 1). In his motion to vacate, Petitioner asserts that his trial counsel provided constitutionally deficient representation when he failed to object to a duplicitous indictment and erroneous jury instructions; when he failed to challenge the racial make-up of the jury pool; and when he failed to file pretrial motions to suppress certain evidence that the Government relied on at trial. Petitioner also asserts that the prosecutor improperly relied on fabricated testimony. The Government filed its response and motion to dismiss on September 1, 2017. (Civ. Doc. No. 5).

8

On September 12, 2017, this Court entered an order giving Petitioner notice of his right to respond to the Government's motion to dismiss. (Doc No. 6). On September 29, 2017, after receiving an extension of time, Petitioner filed a Reply to the Government's motion to dismiss. (Doc. No. 10). In light of certain arguments presented in Petitioner's Reply, the Court ordered the Government to file a supplemental response. (Doc. No. 11). The Government filed its supplemental response on December 18, 2017, and Petitioner filed his Reply on January 3, 2018. (Doc. No. 15). This matter is therefore ripe for disposition.

## II. STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III. DISCUSSION

**1. Petitioner's claims of ineffective assistance of counsel.**

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir.

2010).  Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'"  Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).  Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice."  Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008).  If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong."  United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).  To establish ineffective assistance of counsel at sentencing, a petitioner must show that but for counsel's deficient performance, there is a reasonable probability that he would have received a lower sentence.  See Royal v. Trombone, 188 F.3d 239, 249 (4th Cir. 1999).  If a petitioner fails to conclusively demonstrate prejudice, the reviewing court need not consider whether counsel's performance was deficient.  United States v. Terry, 366 F.3d 312, 315 (4th Cir. 2004).

    **a. Petitioner's contention that his trial counsel improperly failed to object to his indictment because it charged a duplicitous offense.**

Petitioner first asserts that his trial counsel improperly failed to object to his indictment because it charged a duplicitous offense when it charged that Petitioner (1) used a firearm during and in relation to a crime of violence and (2) possessed a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c).  (Doc. No. 1 at 12-14).  For the following reasons, this claim is meritless.

"Duplicity is the improper joining of distinct and separate offenses in a single count." United States v. Root, 585 F.3d 145, 150 (3d Cir. 2009).  "Duplicitous indictments present the risk that a jury divided on two different offenses could nonetheless convict for the improperly

fused double count." United States v. Robinson, 627 F.3d 941, 957 (4th Cir. 2010). The doctrine of duplicity is not, however, an exercise in formulism. See Root, 585 F.3d at 155. A count should not be found impermissibly duplicitous merely because it combines allegations that could have been stated in separate offenses. See id. Rather, a count is impermissibly duplicitous only "when the failure to [state several allegations as separate offenses] risks unfairness to the defendant." Id. Moreover, as the Fourth Circuit has recognized, "[i]t is black letter law that duplicitous indictments can be cured through appropriate jury instructions." Robinson, 627 F.3d at 958.

Here, as Petitioner acknowledges, the indictment charged Petitioner with using or carrying a firearm during and in relation to a drug-trafficking offense and with possessing a firearm in furtherance of a drug-trafficking offense. This Court instructed the jury, however, that the jury had to be unanimous as to how the firearm offense was committed—whether through use of a firearm during and in relation to a drug-trafficking offense or through possession of a firearm in furtherance of a drug-trafficking offense. See (Crim. Case No. 3:12cr316-FDW-DSC-2, Doc. No. 60 at 108). These instructions cured any duplicity in the charge because they made clear to the jury that it was required unanimously to find use or possession to convict Petitioner. If Petitioner had been charged, as he argues he should have been, with two violations of Section 924(c)—one charging a violation through the use of a firearm during and in relation to a drug-trafficking offense and one charging a violation through the possession of a firearm in furtherance of a drug trafficking offense—these instructions would have adequately stated the controlling law and what the jury would have been required to find to support a verdict of guilty of either offense. Petitioner has not alleged any error in the indictment that risked unfairness to him. He has, therefore, failed to show that his trial counsel provided deficient representation

11

when counsel declined to object to the indictment as duplicitous, and he has also failed to show a reasonable probability of a different result, even if counsel had objected to the indictment. Petitioner's first claim of ineffective assistance of counsel, therefore, fails.

**b. Petitioner's claim of ineffective assistance of counsel related to counsel's failure to challenge the racial make-up of the jury pool.**

Petitioner next asserts that his trial counsel improperly failed to challenge the racial make-up of his jury pool, asserting that only two minority potential jurors were among the jury pool and that only one of those individuals served on his jury, resulting in a jury that was disproportionately white. This claim is meritless. The Constitution requires that a criminal defendant receive a jury venire that consists of "a fair cross section of the community." See, e.g., Taylor v. Louisiana, 419 U.S. 522, 527 (1975); United States v. Williams, 264 F.3d 561, 567 (5th Cir. 2001). In Duren v. Missouri, the Supreme Court held that a defendant seeking to establish a violation of the fair-cross-section requirement must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. 439 U.S. 357, 364 (1979). A showing of "mere statistical underrepresentation, without evidence of actual discriminatory or exclusionary practices," does not support a claim that the fair-cross-section requirement was violated. United States v. Lynch, 792 F.2d 269, 271 (1st Cir. 1986); see also United States v. Cecil, 836 F.2d 1431, 1446 (4th Cir. 1988).

Petitioner has not demonstrated that his trial counsel improperly failed to challenge the racial make-up of the jury venire or that this decision prejudiced him because he has not

presented any evidence that if minorities were underrepresented in the jury venire, their underrepresentation was due to "systematic exclusion." Any suggestion that minorities were systematically excluded from the jury venire is speculative. Accordingly, this claim of ineffective assistance of counsel fails.

**c. Petitioner's contention that the district court improperly instructed the jury on the required elements of a conviction under 18 U.S.C. § 924(c), and that trial counsel improperly failed to object to these instructions**.

Similar to his claim that the indictment charged a duplicitous offense, Petitioner next asserts that this Court erroneously instructed the jury that it could find Petitioner guilty of violating Section 924(c) by finding either that Petitioner used or carried a firearm during and in relation to a drug-trafficking offense or that Petitioner possessed a firearm in furtherance of a drug-trafficking offense. (Doc. No. 1 at 15-16). This claim also fails. As the Fourth Circuit explained in United States v. Robinson, in rejecting the same argument, "'[w]hen the Government charges in the conjunctive, and the statute is worded in the disjunctive, the district court can instruct the jury in the disjunctive.'" 627 F.3d 941, 958 (4th Cir. 2010) (quoting United States v. Perry, 560 F.3d 246, 256 (4th Cir. 2009)). This Court made clear that the jury could only convict Petitioner of the Section 924(c) offense if it found unanimously how Petitioner committed the offense—whether by using or carrying a firearm during and in relation to a drug-trafficking offense, possessing a firearm in furtherance of a drug-trafficking offense, or both. This Court, therefore, properly instructed the jury on the elements of a violation of Section 924(c), and Petitioner has not shown either deficient representation or prejudice based on trial counsel's decision not to object to the instructions.

**d. Petitioner's contention that trial counsel should have challenged, through pretrial motions, the admission of any of the evidence admitted against him.**

Petitioner next argues that his trial counsel improperly failed to challenge, through pretrial motions, the admission of evidence against him. Petitioner argues, in particular, that counsel should have challenged the admission of recorded telephone conversations in which Petitioner purportedly participated. He asserts that he was not a participant in those calls and that "even a cursory challenge to the Government's case would have proven that the evidence [that] was presented was not only [inaccurate] but [also] not [Petitioner]." (Doc. No. 1 at 17). Petitioner does not offer any admissible evidence to support this self-serving assertion. Moreover, the Government presented evidence at trial that Petitioner <u>did</u> participate in the recorded calls. Specifically, Allen testified that he recorded telephone calls with Petitioner that were admitted at trial. (Crim. Case No. 3:12-cr-316-FDW-DSC, Doc. No. 59 at 163). Another Government witness at trial, Deputy Ramsey, also testified that he was familiar with Petitioner's voice and that he had reviewed the recorded conversations between Petitioner and Allen that were admitted at trial. <u>See</u> (<u>Id.</u> at 104, 107).

Petitioner also asserts that trial counsel improperly declined to seek the suppression of evidence seized as a result of the searches of Santibanez's property. The Government presented evidence at trial, however, that Santibanez consented to the search of his property, except for specific locations, and those locations were later searched based on a search warrant. Petitioner does not assert that Santibanez lacked the capacity to consent to the search of his property or that the search warrant was improperly issued. <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973) ("It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to

consent."). Petitioner has not shown, therefore, that there is any reasonable probability that this Court would have suppressed the evidence seized from Santibanez's property, even if Petitioner's counsel had moved for suppression. Having shown neither deficient representation nor prejudice, this claim of ineffective assistance of counsel also fails.

### 2. Petitioner's claim of prosecutorial misconduct.

Finally, Petitioner argues that the prosecutor engaged in misconduct by knowingly presenting false testimony at trial from Petitioner's brother Juan Molina-Sanchez. For the following reasons, this claim is without merit.

"To prevail on a claim of prosecutorial misconduct, a defendant must show (1) that the prosecutor's remarks and conduct were, in fact, improper and (2) that such remarks or conduct prejudiced the defendant to such an extent as to deprive the defendant of a fair trial." United States v. Allen, 491 F.3d 178, 191 (4th Cir. 2007). The Due Process Clause prohibits the United States from "knowingly us[ing] false evidence, including false testimony, to obtain a tainted conviction." Napue v. Illinois, 360 U.S. 264, 269 (1959). "[R]egardless of whether the prosecution solicited testimony it knew to be false or simply allowed such testimony to pass uncorrected," the knowing use of perjured testimony violates a defendant's due process rights. Boyd v. French, 147 F.3d 319, 329 (4th Cir. 1998). Testimony by a law enforcement officer that is knowingly false or misleading "is imputed to the prosecution." Id. On collateral attack, a movant alleging that a prosecutor knowingly used false testimony must show: (1) that the testimony at issue was false; (2) that the prosecution knew or should have known of the falsity; and (3) that a reasonable probability exists that the false testimony may have affected the verdict. United States v. Basham, 789 F.3d 358, 376 (4th Cir. 2015).

15

Petitioner's claim that the United States knowingly used the false testimony of his brother, Juan Molina-Sanchez, is meritless. In response to the motion to dismiss, Petitioner submitted an affidavit of Petitioner's brother, Juan Molina-Sanchez, in which Juan claims to have perjured himself at trial. In his affidavit, Juan Molina-Sanchez asserts that he lied about "the manner, location and identification of [Jorge Molina-Sanchez] and his role in the alleged conspiracy." (Doc. No. 10 at ¶ 6). Juan Molina-Sanchez also asserts that the United States "was aware of the inconsistencies of [his statements] prior to trial" and that Juan Molina-Sanchez testified "as part of an agreement between [Juan Molina-Sanchez] and the [United States] . . . to convict [Jorge Molina-Sanchez]." (Id. at ¶¶ 4, 9).

Juan Molina-Sanchez's affidavit does not support Petitioner's claim of prosecutorial misconduct based on the presentation of false testimony. First, Juan Molina-Sanchez states that the United States was "aware" of inconsistencies in his statements before trial, but he does not explain what those inconsistencies were or how they undermined his testimony. Juan Molina-Sanchez also does not assert that the United States failed to disclose to Petitioner the inconsistencies of which it was aware. Inconsistencies within a cooperator's statements is not unusual and does not support a claim of prosecutorial misconduct unless the United States hid those inconsistencies and they would have made a difference. Petitioner has not shown that he was unaware of inconsistencies in Juan Molina-Sanchez's statements or that the inconsistencies were significant enough that, had he been aware of them, there is a reasonable probability that he would have been acquitted.

Second, Juan Molina-Sanchez's statement that the United States presented his testimony as part of an agreement with Juan Molina-Sanchez to convict Petitioner and to "force [Petitioner's] cooperation with further investigations" does not support a claim that the United

16

States knew that Juan Molina-Sanchez's testimony was false. At most, this statement suggests that the United States induced Juan Molina-Sanchez to assist the United States, but inducing a participant in a crime to cooperate with the prosecution of a coconspirator is not misconduct.

Finally, Petitioner has not shown a reasonable probability that he would have been acquitted without his brother's testimony. In addition to Juan's testimony, the United States presented the testimony of Lloyd Allen, who was a member of the charged conspiracy and testified about Petitioner's participation in the conspiracy. The United States also presented the testimony of law enforcement officers about the seizure of cash and cocaine from a car that contained paperwork from Petitioner and cash and cocaine from Petitioner's home and from a law enforcement officer who interviewed Petitioner when Petitioner admitted that he owned a car that contained a hidden compartment. The evidence against Petitioner was overwhelming. Juan Molina-Sanchez's affidavit does not support the conclusion that the United States knowingly presented false testimony or that Petitioner would have been acquitted had Juan's testimony been excluded from the trial. Accordingly, Petitioner's claim of prosecutorial misconduct fails as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's Section 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2. The Government's Motion to Dismiss, (Doc. No. 5), is **GRANTED**.

3. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: January 19, 2018

Frank D. Whitney
Chief United States District Judge